# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| KIMBERLY SPURLING, | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:11 CV 39 |
| | ) | |
| C&M FINE PACK, INC., | ) | |
|     Defendant. | ) | |

## OPINION AND ORDER

Kimberly Spurling was employed by C&M Fine Pack as a packer/inspector on its factory line. Spurling repeatedly fell asleep on the job and was subjected to C&M's progressive discipline policy. After being warned that any further incidents of falling asleep could result in her termination, Spurling fell asleep at work again. She was suspended pending termination, and her superiors recommended that she be fired. But before C&M management formally approved Spurling's firing or communicated it to her, Spurling announced that contrary to what she had previously told C&M on numerous occasions, it was possible that she was suffering from a medical condition that was causing her to fall asleep at work. Spurling produced paperwork from her doctor which indicated that she was suffering from "drowsiness" and needed scheduled periods of rest to accommodate her drowsiness. C&M fired her nonetheless, prompting Spurling to sue under the Americans with Disabilities Act and the Family Medical Leave Act.

This matter is before the Court on the parties' cross-motions for summary judgment [DE 21; DE 23]. For the reasons explained below, the Court **DENIES** Spurling's motion for summary judgment and **GRANTS** C&M's motion for summary judgment.

**BACKGROUND**

C&M Fine Pack[1] produces plastic packaging for the food industry [DE 24-1 at 6], and from February 2004 to April 28, 2010, Spurling worked as an inspector and packer on C&M's third shift, which ran from 11:00 pm to 7:20 am [DE 22-4 at 5; DE 24-1 at 6; DE 24-2 at 4, 9; DE 24-5 at 1]. At the risk of stating the obvious, one of Spurling's responsibilities was to stay awake while inspecting products [DE 24-5 at 2]. While she worked at C&M, Spurling also moonlighted (or "daylighted," as it were) on another job at a Hallmark store [DE 24-2 at 7-9]. On those days, she typically worked two days a week at Hallmark for approximately four hours before reporting to C&M [*Id*].

Early in her tenure at C&M, Spurling received some verbal disciplinary warnings and negative or "below expectations" performance reviews [DE 24-2 at 11-17; DE 24-6 at 5, 8-9]. And as early as February 2009, C&M began to reprimand Spurling for sleeping at work [DE 22-5; DE 24-1 at 15-16]. In June 2009 and March 2010, coworkers reported that Spurling was having a difficult time keeping her eyes open, walking, standing, and keeping her head up, although it does not appear that these instances resulted in formal warnings [DE 22-27 at 1, 3, and 5]. Spurling also received warnings for "not keeping up on her line" in May and October 2009 [DE 22-6; DE 22-7; DE 22-8; DE 24-2 at 21-22]. Spurling was explicitly told in May 2009 that she needed "to make sure that she informs the supervisor about any issues that does [sic] not allow her to do her job at an acceptable rate of speed" [DE 24-6 at 12]. And then in October Spurling was warned that another incident of failing to keep up could "result in a written

---

[1] C&M Fine Pack's name is now D&W Fine Pack, LLC, but the parties' submissions all refer to it as C&M [DE 24 at 2, n.1]. I will also refer to it as C&M.

warning including suspension up to termination of employment" [DE 22-8; DE 24-2 at 21-22; DE 24-6 at 14].

On February 15, 2010, Spurling left her position on the line to use the restroom [DE 22-9 at 1-2; DE 24-6 at 16]. Twenty minutes later, a C&M employee found her asleep in a bathroom stall [DE 22-9 at 1-2; DE 24-6 at 16]. Spurling was suspended and told that falling asleep at work was a "huge concern for your safety and the safety of those working around you," and that "future incidents of this nature will lead to further disciplinary actions up to and including termination of your job" [DE 22-9 at 1-2; DE 22-10; DE 24-2 at 18-19, 22-23; DE 24-6 at 16]. Spurling was also warned that "[i]t is important that you get the amount of sleep your body requires so that when you come to work you are able to stay awake and perform the necessary tasks required by your employer" [DE 22-9 at 2; DE 22-10; DE 24-6 at 16]. Spurling's warning explicitly stated that "it is critical that Kim understands that future issues of this kind could lead to the termination of her job" [DE 22-10; DE 24-2 at 18-19; DE 24-6 at 16].

Darrin Claussen (the Plant Manager) and other C&M supervisors met with Spurling upon her return from disciplinary suspension in February 2010 [DE 22-11; DE 25-2 at 2-3]. At the meeting, Spurling said that she understood that she had been suspended because she fell asleep while she was working [DE 22-11]. Spurling explained to her superiors that she had been using a new medication, and that her doctor had sent a "note of explanation" and that the medication had been changed "to help with this condition" [DE 22-11; DE 22-19; DE 24-2 at 23-24]. Spurling had been prescribed Paxil for her complaints of anxiety and depression [DE 29-1 at ¶5]. But the doctor changed her medication to Zoloft because of dizziness that led to her falling and hitting her head. [DE 22-19; DE 29-1 at ¶6].

-3-

At the February meeting, Spurling was asked if she had a medical condition that could be causing her to fall asleep, and she responded that she did not [DE 24-2 at 19-20, 24; DE 24-4 at 10-11; DE 25-3 at 9]. At the meeting, Claussen reminded Spurling that any more disciplinary action would result in her termination [DE 22-11].

Less than two months later, Spurling again fell asleep at work. On the day in question, her coworkers twice reported that she had her eyes closed and her head was down, and they had to call her name loudly to wake her up [DE 22-12 at 1-3; DE 24-6 at 18]. Evidently, Spurling was continually sleeping on the job because her manager reported that her sleeping had gotten worse since the February meeting [DE 22-12 at 1].

As a result of the latest incident of her falling asleep at work again, Paul Bellant (the plant's Human Relations Manager) met with Spurling on April 15, 2010 [DE 22-13; DE 24-2 at 27-28; DE 24-6 at 18]. At the meeting, Bellant told Spurling that she was being suspended pending termination as part of C&M's progressive discipline practice [DE 22-13; DE 24-1 at 18; DE 24-2 at 28-29, 38; DE 24-4 at 9; DE 24-6 at 18]. Bellant instructed Spurling that he was going to communicate C&M's termination decision to her by April 19, 2010, and that if she had any further information, she should contact Bellant before that date [DE 22-13; DE 24-1 at 18-19; DE 24-6 at 18; DE 25-1 at 9; DE 25-2 at 4].

Later on April 15, Bellant wrote to Claussen, the Plant Manager, summarizing the incident and the subsequent meeting with Spurling [DE 22-14; DE 24-3 at 7]. Bellant wrote that Spurling confirmed that at the time of the February 2010 incident, "she had been taking medication at that time that made her drowsy and since then had switched her medication and the time she took it. She stated she has had no problems with being drowsy since" [DE 22-14].

According to Bellant, Spurling said that the informing employees were lying about her sleeping; they were motivated by their dislike of Spurling and they simply wanted to get her into trouble [DE 22-14]. Bellant also wrote that he asked Spurling why she was taking medication, and that Spurling responded that it was "for nerves" [DE 22-14]. Bellant wrote that he asked Spurling if she had any medical conditions that could affect her ability to do her job, and she said that she did not [DE 22-14; DE 24-4 at 7]. Bellant said that he informed Spurling that she would be receiving another disciplinary action for falling asleep, that her file contained at least three write-ups from the past year, and that she was being suspended pending C&M's final disciplinary determination, which could include termination [DE 22-14].

As the local Human Resources person, Bellant did not have the authority to fire Spurling [DE 24-4 at 6; DE 25-1 at 11]. Rather, he could only recommend termination to Jeff Swoyer, who was C&M's Vice President for Human Resources [*Id.*]. Swoyer would review the request and grant or deny it [*Id.*]. But Bellant did have the authority to suspend Spurling pending termination, and that's what he chose to do [*Id.*]. Spurling was then escorted from the building [DE 22-14].

Later that day, Spurling went to her doctor, James Beitzel, who decreased Spurling's medication [DE 29-1 at ¶¶ 8-9]. Dr. Beitzel referred Spurling to a specialist in sleep disorders, and ordered blood testing and lab work [DE 29-1 at ¶¶ 10, 12].

On April 16, 2010, at 10:32 AM, Bellant wrote an email to Swoyer with the subject "Termination of Employee," outlining the process regarding termination, informing Swoyer that Bellant, Claussen, and others were recommending that Spurling be terminated, and attaching information for Swoyer's review [DE 24-6 at 20]. Later that day, Bellant wrote Swoyer another

email, with the subject "Termination of Employee Update," which included the same text as his earlier email, but added a paragraph at the end that he had "just received a phone call" from Spurling, and that she had told Bellant that she "may have a medical condition that is causing this issue" [DE 22-20].  Swoyer wrote back and noted that he found it "interesting that after all of the discussion sessions and conversations" that Spurling had "waited until the point of termination to try to establish her eligibility for protection under either FMLA or ADA" [DE 22-21].  Swoyer also questioned whether to refer Spurling's case "to counsel for guidance" [DE 22-21; DE 24-4 at 13].

Spurling returned to C&M on April 16 and asked Bellant for ADA paperwork to take to her doctor [DE 24-1 at 18-19; DE 24-2 at 29; DE 25-1 at 3, 9; DE 25-2 at 4].  Spurling also claims that at the time that she got the ADA paperwork, she requested some time off "to see what my problem was" and why she was falling asleep [DE 22-17 at 8; DE 24-2 at 32-33].  She did not request leave in writing [DE 24-2 at 33].  Bellant denies that she made any such request [DE 24-1 at 11-12; DE 25-1 at 5, 10; DE 28-2 at 12]. Bellant provided Spurling with the paperwork and instructed her that she would have to provide the information requested to determine if her claimed medical condition warranted ADA consideration [DE 24-1 at 7; DE 22-2; DE 24-2 at 29].  The paperwork consisted of a standard letter to the physician requesting that he complete the paperwork [DE 22-3 at 1], a description of Spurling's position [DE 22-3 at 3-4], and a form for the physician to complete [DE 22-3 at 2; DE 24-1 at 7-9; 37; DE 25-1 at 3].

Spurling took the paperwork to Dr. Beitzel on April 16, and he completed the paperwork on April 21, 2010 [DE 29-1 at ¶11].  Dr. Beitzel checked a box indicating that "yes," Spurling had a mental or physical disability covered under the ADA, and he made a handwritten notation

that "pt has excessive drowsiness that affects her job" [DE 22-3 at 2; DE 22-17 at 5-6; DE 24-1 at 9; DE 24-6 at 22; DE 25-1 at 4]. Beitzel also indicated that Spurling "may not be able to perform the essential job functions," but that the "reasonable accomodation" of "periods of scheduled rest" should be considered [DE 22-3 at 2; DE 22-17 at 5-6; DE 24-1 at 11; DE 24-6 at 22; DE 25-1 at 5]. Beitzel also wrote on the form "add'n medical work up in progress" [DE 22-3 at 2; DE 24-6 at 22; DE 25-1 at 4]. The form did not diagnose Spurling with narcolepsy or mention narcolepsy in any way [DE 24-2 at 30; DE 24-6 at 22].

When Spurling returned the paperwork on April 21, Bellant told Spurling that C&M would review it [DE 24-1 at 9; DE 25-1 at 4]. On Friday, April 23, 2010, Bellant forwarded to Swoyer Spurling's ADA paperwork that had been filled out by her doctor, noting that the doctor had indicated that Spurling may not be able to perform key functions of her job [DE 22-22; DE 25-1 at 6]. Bellant and Claussen discussed the suggested accommodation, but felt that Spurling was already being given scheduled rest in the form of her half hour lunch break and an additional two ten-minute breaks during her shift [DE 24-1 at 11; DE 25-1 at 5]. The following day, Bellant wrote to Swoyer that he had consulted with Spurling's superiors and that he still recommended terminating Spurling because they had conducted an interactive process with her during the progressive disciplinary process: they asked Spurling if she had a medical condition that could have been causing her sleepiness and she said no; and they offered to have Spurling move to a different shift, which she declined [DE 22-25; DE 24-2 at 35]. Bellant also noted that the doctor's request for additional breaks was not reasonable, especially because Spurling already had breaks on her shift [DE 22-25].

Bellant called Spurling on the telephone on April 28, 2010 and informed her that C&M

was terminating her [DE 22-15; DE 24-1 at 14; DE 24-6 at 24]. During that phone call, Spurling mentioned the medical testing, and Bellant said that the decision had been made to terminate her had been made at a level above Bellant [DE 25-1 at 8; DE 25-4 at 7].

It is undisputed that at the time that Spurling was terminated for repeatedly falling asleep on the job, C&M did not know that she had been diagnosed with narcolepsy [DE 24-2 at 31, 38; DE 25-4 at 8]. Indeed, C&M could not have known this because even Spurling didn't know it. Spurling was repeatedly asked at her deposition when she was diagnosed with narcolepsy and she repeatedly admitted that it wasn't until after her termination. [DE 24-2 at 6, 31, 33-34].

## DISCUSSION

### I. Spurling's ADA Claim

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The non-moving party must then set forth specific facts showing that there is a genuine issue of material fact and that the moving party is not entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The ADA prohibits employers from discriminating against employees on the basis of their disabilities. *Dickerson v. Bd. of Trustees of Community College Dist. No. 522*, 657 F.3d 595, 600 (7th Cir. 2011). "To establish a *prima facie* case of discrimination, a plaintiff must show that (1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the

essential functions of her job either with or without reasonable accommodation, and (3) she has suffered from an adverse employment decision because of her disability." *Dvorak v. Mostardi Platt Associates, Inc.*, 289 F.3d 479, 483 (7th Cir. 2002).

For an employer to discriminate against an employee "because of" her disability, the employer must have knowledge of the disability. *Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 931-32 (7th Cir. 1995). Common sense tells us that if an employer terminates an employee when it "does not know of the disability, the employer is firing the employee 'because of' some other reason." *Id.* at 932. *See also Ekstrand v. School District of Somerset*, 583 F.3d 972, 975 (7th Cir. 2009) (employer must know of the disability to be liable under the ADA).

In this case, Spurling argues that her narcolepsy was, in fact, a disability, and that she was qualified to perform the essential functions of her job once her narcolepsy was controlled with medication. I can set those claims aside for the moment because the issue at the heart of this case lies in the third element of the *prima facie* case, which is essentially a question of causation: did C&M fire Spurling because she was disabled or did they fire her for some other reason? Because C&M's decision to terminate Spurling was made before it learned of her narcolepsy, Spurling is unable to prove that she was fired "because of" her disability. So I need not decide whether Spurling was in fact disabled or was otherwise qualified to perform her job.

There is no question that Spurling fell asleep on the job multiple times. This eventually led to her termination when several coworkers reported that she was sleeping during her shift on April 12, 2010. There is also no dispute that on April 15, 2010, the day that Spurling was suspended pending termination, C&M had no knowledge of her narcolepsy or any medical disability. Spurling first informed C&M on April 16 that she *might* have a medical condition –

contrary to what she had told C&M at her disciplinary meeting the day before. And according to Bellant's email correspondence with Swoyer, at the time that he first recommended to Swoyer that Spurling be terminated, she had not informed Bellant that she might have a medical condition causing her to sleep [DE 22-20; DE 24-6 at 20]. In other words, Bellant's recommendation to Swoyer that Spurling should be terminated was made *without* knowledge of any potential medical condition, and thus he could not have recommended that she be terminated "because of" her disability.

Although it was before the Seventh Circuit in a different procedural posture, *Adkins v. Briggs & Stratton*, 159 F.3d 306 (7th Cir. 1998) presented a near identical set of facts as the present case. In *Adkins*, the plaintiff was fired for repeatedly sleeping on his forklift truck and he brought an ADA claim based on his disability of narcolepsy. *Id.* at 307. But because the plaintiff admitted that he did not get the narcolepsy diagnosis until four months after he was fired, the district court dismissed the case, reasoning that the employer could not have fired the plaintiff because of his disability when they didn't even know that he had a disability. *Id.* The Seventh Circuit remanded on the ground that the district court should have considered awarding fees and costs to the employer. *Id.* at 307-08.

*Kolivas v. Credit Agricole*, 1996 WL 684167 (S.D.N.Y. Nov. 26, 1996), *aff'd,* 125 F.3d 844 (2d Cir. 1997), presents another factually analogous situation to this case. There, the employee's supervisor made the decision to terminate him for his poor work habits, and recommended to the company's human resources department that the employee be terminated. *Id.* at *1-2. After that recommendation was made, but before the termination was formally approved and the employee was officially terminated, the employee informed the employer that

he had a disability and was under a doctor's care and being treated with medication. *Id.* at *2. The employer asked for a doctor's note, which the employee provided, but the note did not indicate the nature of the employee's medical condition. *Id.* After receipt of the doctor's note, the HR employee who had received the termination recommendation communicated the request to the company's director of HR, who approved it, and the company's president finally approved the request the following day. *Id.* The employee was then informed of his termination. *Id.* The court found that because the employee's superior communicated her desire to terminate the employee prior to learning that the employee was disabled, the employer "had already begun the process to fire the plaintiff," indicating that there was not "a causal connection between the decision to terminate [the employee] and knowledge of any disabling condition." *Id.*

This reasoning is persuasive, and it is consistent with *Hedberg*. And although the *Hedberg* court cautioned that "if an employee tells his employer that he has a disability, the employer then knows of the disability, and the ADA's further requirements bind the employer," the case goes on to say that if the employer begins the termination process without knowledge of the employee's disability, the employer cannot be liable under the ADA. 47 F.3d at 932-34.

The process to terminate Spurling was well underway by the time that she informed C&M that she might have a disability and was under a doctor's care. Recall that Spurling had fallen asleep several times and was repeatedly warned and suspended under C&M's progressive discipline policy. Recall as well that she was specifically warned two months earlier that if she fell asleep on the job again, she could be fired. All of which suggests that the evidence of causation is entirely lacking in this case.

Spurling essentially argues that under the ADA, once she notified Bellant that she *might*

have a "medical condition," the termination process was legally required to come to a halt.  But this cannot be the case.  Bellant's commencement of the termination process against Spurling before he knew that she possibly had a disability establishes that there is no causal connection between his decision to terminate her and his knowledge of her disability.  *Cf. Adkins*, 159 F.3d at 307; *see also Canales-Jacobs v. New York State Office of Court Admin.*, 640 F. Supp. 2d 482, 499-500 (S.D.N.Y. 2009) (finding that notice to employer of plaintiff's disability on the "eve of a hearing . . . seeking her termination" was insufficient to show that employer had notice of the plaintiff's condition).

Moreover, the notice that C&M received on April 21, 2010, that Spurling was suffering from "excessive drowsiness," can hardly be considered as shedding light on Spurling's vague "medical condition."  To the contrary, it only confirmed what C&M already knew: that Spurling was having a difficult time staying awake on the job.  And while Dr. Beitzel did, in fact, check a box that indicated that Spurling had an ADA disability, it is clear that the process to terminate Spurling for numerous and well-documented disciplinary transgressions was well underway before Spurling returned the paperwork.

Spurling tries to make an additional argument that was flatly rejected by the *Hedberg* court: that "firing someone 'because of' the symptoms of his disability is the same as firing him 'because of' the disability itself."  47 F.3d at 931-32.  "Under this theory, even if the employer knew nothing about the disability, if he knew of the symptoms and fired the employee because of them, the ADA binds him."  *Id.* at 933.  Spurling is correct that she was fired "because of" her sleeping on the job.  But she is incorrect in arguing this is the same thing as firing her "because of" her narcolepsy, which was undiagnosed at the time of her termination.  As the Seventh

Circuit explained in *Hedberg*, employers frequently fire people based on how they perform, and "[a]llowing liability when an employer indisputably had no knowledge of the disability, but knew of the disability's effects, far removed from the disability itself and with no obvious link to the disability, would create an enormous sphere of potential liability." 47 F.3d at 934. As is relevant here, poor work habits have a number of causes, "few of them based in illness," and the ADA obviously does not require that an employer who observes these poor work habits must somehow divine that the reason for the poor performance is a disability. *Id.* "The ADA hardly requires . . . an employer who has not been informed of the disability, and who has no reason to know of the disability . . . to retain all apparently tardy and lazy employees on the chance that they may have a disability that causes their behavior." *Id.*

In this case, not only was C&M not required to divine that Spurling's sleeping on the job might be caused by a disability, it was completely reasonable in thinking that Spurling's "wakefulness problems" were caused by an altogether more likely culprit: her schedule. Spurling worked the graveyard shift, where workers falling asleep was not uncommon, and she held down a second part time job at a Hallmark store, to boot. So it is not at all surprising that C&M specifically warned Spurling that "[i]t is important that you get the amount of sleep your body requires so that when you come to work you are able to stay awake and perform the necessary tasks required by your employer" [DE 22-9 at 2; DE 22-10; DE 24-6 at 16]. C&M even went so far as to offer Spurling the opportunity to change shifts to alleviate her sleeping problems, which she refused. Moreover, Spurling repeatedly told C&M that she *didn't* have a medical problem that could be causing her sleeping issues. Such was the situation when Bellant – in consultation with other plant supervisors – recommended to Swoyer that Spurling be

terminated.

When viewing this case as a whole, it is clear that Spurling had a long and well-documented history of falling asleep on the job, rendering her unable to perform the duties of her position, and C&M had no idea that she was falling asleep because of a disability. Spurling was asked and denied that she had a medical condition, was warned repeatedly that she could be terminated, and waited until she was on termination's doorstep before she sought a doctor's care or informed her employer that she might have a disability covered by the ADA. But it was too little, too late, because ". . . an employee cannot keep [her disability] a secret up until the moment that he or she is in danger of being fired and expect the revelation and the threat of a lawsuit to erase all of his or her prenotice misconduct." *Peyton v. Otis Elevator Co.*, 72 F. Supp. 2d 915, 922 (N.D. Ill. 1999).

In sum, Spurling herself didn't know that she had narcolepsy until over a month after she was terminated from C&M. To which we ask: how, if she did not know she had a disability, would one reasonably expect her employer to divine that fact? The evidence is plain that C&M was entirely unaware of Spurling's disability when it decided to terminate her. Therefore, summary judgment on the ADA claim is appropriate.

**II.     Spurling's FMLA Claim**

Spurling also argues that C&M interfered with her right to take FMLA leave to complete medical testing by firing her, instead of allowing her to take FMLA leave [DE 21; DE 22 at 16]. The FMLA grants eligible employees the right to take unpaid leave for up to twelve work weeks per year for a "serious health condition" as defined by the statute. *King v. Preferred Tech. Group*, 166 F.3d 887, 891 (7th Cir. 1999). To ensure the availability of these rights, the FMLA

makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." *Kauffman v. Federal Exp. Corp*, 426 F.3d 880, 884 (7th Cir. 2005), quoting 29 U.S.C. § 2615(a)(1). To prevail on an FMLA interference claim, the plaintiff-employee must show that:

> (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled.

*Simpson v. Office of Chief Judge of Circuit Court of Will County*, 559 F.3d 706, 712 (7th Cir. 2009).

Spurling claims that she asked for medical leave on April 16, which C&M denies happened. For purposes of this motion for summary judgment, I will look at the evidence in the light most favorable to Spurling and credit Spurling's testimony on this point. But even assuming that she asked for time off for medical testing on April 16, 2010, Spurling's claim still fails. Assuming that Spurling was eligible for FMLA protection, and that C&M was covered by the Act, Spurling still wasn't denied rights that she was entitled to exercise.

Spurling claims that C&M denied her the right to FMLA leave to obtain medical treatment, and essentially argues that once she asked for time off for medical testing, C&M could not fire her. Instead, according to Spurling, they should have simply given her the time off to obtain medical treatment and then allowed her to come back to work. But this argument is flawed, because the FMLA "does not confer benefits to which an employee would not be entitled had the employee not taken leave." *Ogborn v. United Food and Comm. Workers Union, Local No. 881*, 305 F.3d 763, 768 (7th Cir. 2002). Thus, an employer may fire an employee for poor performance if she would have been fired for her performance regardless of having taken leave.

*Simpson*, 559 F.3d at 712; *see also Phelan v. City of Chicago*, 347 F.3d 679, 683 (*quoting Kohls v. Beverly Enterprises Wisconsin, Inc.*, 259 F.3d 799, 805 (7th Cir. 2001)) ("...an employee may be fired for poor performance when she would have been fired for such performance even absent her leave"). Similarly, and as is relevant here, "[n]o FMLA violation occurs where an employer has already decided to terminate the employee before the employee requests FMLA leave." *Gorski v. Med. Protective Co.*, 2010 WL 4684023, at *13 (N.D. Ind. Nov. 10, 2010) (no FMLA violation where employer had begun preparing to terminate employee before employee requested FMLA leave). At the time that C&M began the process of terminating Spurling – a prospect that she had been warned about repeatedly – it had no notice that Spurling had any kind of serious medical condition, and "FMLA leave depends on the employer's knowledge of a qualifying condition." *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003).

And although Spurling did not actually take leave – unlike the employee in *Simpson* – this is a distinction without a difference, for C&M surely need not have placed Spurling on FMLA leave, waited for her to return, and *then* fired her. Similarly, *Simpson*, *Phelan*, and *Kohls* foreclose Spurling's argument that Bellant writing to Swoyer that he was placing Spurling on a "LOA" (leave of absence) somehow rendered C&M unable to fire her. To the contrary, an employee can be terminated for "inappropriate work behavior" while she is at work, or while she is on FMLA leave. *Daugherty v. Wabash Ctr., Inc.*, 572 F. Supp. 2d 1003, 1014 (N.D. Ind. 2008), *aff'd*, 577 F.3d 747 (7th Cir. 2009).

Spurling argues, however, that C&M was on notice *before* April 16 that she had a serious medical condition because of her prior episodes of falling asleep at work, and that under *Byrne,* 328 F.3d at 381, an employee's "unusual behavior" is all that is required to put the employer on

notice that FMLA leave is needed [DE 22 at 20]. But Spurling's behavior on April 12 was far from unusual; it was a continuing course of conduct that had been going on for over a year. A coworker first reported that Spurling was beginning to show signs of sleeping on the job in February 2009. Her well-documented behavior could hardly be characterized as the type of "dramatic change in behavior" that serves as notice of a serious medical problem that was present in *Byrne*, where a previously stellar employee suddenly began hiding in a break room and sleeping for hours on end due to the onset of major depression. *Id.* at 382. Spurling did not put C&M on notice that she was requesting medical leave before C&M decided to terminate her, and C&M did not interfere with Spurling's FMLA rights.

## CONCLUSION

For the foregoing reasons, Spurling's Motion for Summary Judgment [DE 21] is **DENIED**, and C&M's Motion for Summary Judgment [DE 23] is **GRANTED.**

**SO ORDERED.**

ENTERED: July 18, 2012

s/ Philip P. Simon  
Philip P. Simon, Chief Judge  
United States District Court